# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 8018 | **DATE** | 7/23/2001 |
| **CASE TITLE** | Perez vs. Velasco | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Carter's motion for summary judgment (65-1) is granted; his motion to strike (73-1) is denied as moot. The remaining defendants' motion for summary judgment (62-1) is granted as to all defendants except Lt. Delano Scaife. The date for filing the final pretrial order is reset to 8/221/00. The case is set for a status hearing on 8/23/01 at 9:30 a.m. to discuss the possibility of advancing the trial date.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUL 25 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 78 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | | |
| OR | courtroom deputy's initials | 01 JUL 24 PM 6: 39 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| FRANCISCO PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98 C 8018 |
| | ) | |
| ERNESTO VELASCO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**
**JUL 2 5 2001**

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Francisco Perez, a former pretrial detainee at the Cook County Department of Corrections (CCDOC) and a former inmate at the Illinois Department of Corrections' Joliet Correctional Center, has brought this suit under 42 U.S.C. §1983 against Lamark Carter, the warden of Joliet, and several CCDOC officials. Perez has brought two sets of claims. First, he alleges that he contracted tuberculosis while confined at either Joliet or the CCDOC and that this was due to certain of the defendants' deliberate indifference to his safety and that of other inmates. Second, Perez alleges that several of the CCDOC defendants, Ernesto Velasco, the Executive Director; James Edwards, the Superintendent of CCDOC Division 9; John Maul, Assistant Executive Director of Operations; Marcus Lyles, the Associate Executive Director of Internal Programs; Sergeant Naverette and Lieutenant Delano Scaife, officers employed by the CCDOC, failed to protect him from an attack by another pretrial detainee, George Rosario. All of the defendants have moved for summary judgment.

1.  **Claim regarding tuberculosis**

    Perez has withdrawn his claim against the CCDOC defendants relating to his contraction

of tuberculosis, leaving only Warden Carter as a defendant on that claim. Perez says that he contracted TB while imprisoned at Joliet Correctional Center. He alleges that Warden Carter was aware of the serious risk to inmates of TB exposure yet failed to put in place reasonable measures to control the spread of the disease.

The incidence of tuberculosis in prisons has been on the rise since the early 1980's. In some state prison systems, the incidence of the disease is ten times that found in the population at large. The federal Centers for Disease Control has noted that "[t]he transmission of ... tuberculosis in correctional facilities presents a health problem for both inmates and the communities into which they are released," particularly to young children, who are especially vulnerable to the disease if infected. Correctional facility employees are also at risk, and if exposed they too can carry the disease to the community at large. The CDC has developed detailed recommendations for screening and containment of the disease.

Perez arrived at JCC in September 1996, when he was transferred from the CCDOC, and remained there through February 1998, when he was returned to the CCDOC. Upon his return to the CCDOC, Perez was given a standard TB test and tested positive. Because previous TB tests performed on Perez had been negative, it is fairly clear that he contracted TB at JCC. The most common method by which a person contracts TB is by exposure to a person who has active TB and is coughing.

A chest x-ray taken at the CCDOC showed that Perez did not have active TB. A person with "latent" TB like Perez has about a 10% chance of developing active TB, unless he receives preventative treatment, which reduces the risk to 1%. Perez has received preventative treatment. He claims, however, that he feels more tired and fatigued than he did in the past and that he

2

coughs more often.

The IDOC's protocol for preventing and treating TB was established under the direction of the Department's medical director, at an agency-wide level, through an Administrative Directive. Carter had no involvement in the establishment of the protocol. Wardens of individual IDOC facilities are required to abide by the Administrative Directive and cannot override it or interfere in the medical judgment of either the agency's medical director or the facility's medical director unless a security issue is presented.

During the relevant period, the IDOC tested all incoming inmates for TB through what is referred to as a PPD test. If an inmate tests positive, he is given a chest x-ray and examined for symptoms of TB, including a prolonged cough, chest pain, coughing up blood, fever, chills, night sweats, easy fatigue, loss of appetite, and weight loss. If the inmate has any of those symptoms, a sputum test is administered and a culture is grown, and the inmate is quarantined pending results of the testing. If the test is negative, the inmate has inactive or non-infectious TB (like Perez) and is placed on a six month prophylactic treatment with two drugs (more recently, this was changed to a nine month period). If the test is positive, the inmate is treated with four drugs for two weeks, after which another sputum test is administered. If this test is negative, the regimen is dropped to two drugs for six weeks while awaiting the results from cultures. Defendant's submission does not indicate whether inmates with active TB are quarantined.

Though IDOC Medical Director Dr. Willard Elyea claims that the IDOC's protocol complies with recommendations from the Centers for Disease Control, there is some evidence suggesting that it does not. According to Dr. Robert Greifinger, former Chief Medical Officer of the New York State Department of Correctional Services, who reviewed the IDOC's protocol at

the request of Perez's counsel, the CDC recommends that inmates who have tested positive for TB be asked annually whether they have any of the symptoms associated with TB. The IDOC's protocol relies on self-reporting by the inmates, as well as a routine physical every three years if the inmate is under 40 and every two years if the inmate is over 40. Dr. Greifinger says that this is the only way to determine whether such inmates' latent TB has developed into the contagious form of the disease.

If Dr. Greifinger is correct,[1] there may well be flaws in the IDOC's protocol, flaws which might result in inmates, prison guards and others being unnecessarily exposed to an inmate whose latent TB has developed into active TB. In an appropriate case, proof that the IDOC had a screening-and-containment protocol that was inadequate and that presented a known risk of exposure to TB might result in the imposition of liability under the Eighth Amendment. But in order to impose liability on a government official for a constitutional violation, the plaintiff must demonstrate that the official was personally responsible for the deprivation of the plaintiff's constitutional rights. *E.g., Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). In this case Perez has no evidence from which a reasonable jury could find that Carter was personally responsible for the IDOC's protocol, let alone any deficiencies in that protocol. Rather, the undisputed evidence shows that Carter had nothing to do with the development of the protocol and that he was required implement the agency's established protocol at JCC. Thus if liability exists for any inadequacies in the protocol, it exists elsewhere – perhaps at the level of the agency's medical director (who is not a defendant in this case). Carter is entitled to entry of summary judgment in

---

[1] Carter has moved to strike Dr. Reifinger's affidavit on the grounds that Perez did not timely disclose Dr. Reifinger as a possible expert witness. In view of the Court's disposition of Carter's summary judgment motion, we deny the motion to strike as moot.

4

his favor.

## 2. Claim regarding attack by Rosario

Perez and Rosario lived on the same floor in the CCDOC, Tier 2F of Division 9, but they had no problems with one another until August 3, 1998. On that date, Perez, Rosario, and another inmate, Spain, were playing basketball together when an argument erupted. Rosario called Perez and Spain "punks and bitches" and grabbed a stick. A prison officer broke up the fight and called Lieutenant Scaife and a sergeant. Lt. Scaife, after a conversation with Perez, moved Rosario from Tier 2F to a cell on Tier 2E.

In Division 9, one officer was supposed to guard Tier 2E and another was supposed to guard Tier 2F. However, the tiers were often "cross-watched" by one officer overseeing both at the same time. On August 8, 1998, Officer Hornbostel was cross-watching Tiers 2E and 2F from the "interlock area," an area between the two tiers which has doors on each end leading to the two tiers. The interlock door to Tier 2F was often problematic: sometimes it would not lock, and its control panel failed to indicate when the door was secure. According to both Rosario and Spain, inmates knew about this faulty door and would travel freely between Tiers 2E and 2F.

Rosario testified that on August 8, 1998 the interlock doors were open on both sides. He thereby slipped through the interlock area, entered Tier 2F, and began hitting Spain with a stick. Perez says he caught Rosario's attention to try to prevent further harm to Spain. As a result, Perez says, Rosario started beating him with the stick.

Perez claims the defendants violated his Fourteenth Amendment right as a pretrial detainee to be protected from violence at the hands of other inmates. *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). To prevail, Perez must show that the defendants were deliberately

5

indifferent to his safety and that he suffered an injury as a result. *Id.,* citing *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). To prove deliberate indifference on the part of a particular defendant, Perez must show that he suffered a serious risk of danger and that the defendant had actual knowledge of that risk but ignored it. *Id.* A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

It is undisputed that Rosario posed a threat to Perez's well-being following the altercation on the basketball court. To prevail, however, Perez must demonstrate that Rosario still posed a serious threat to him even after he was moved to Tier 2E. There is evidence from which a reasonable jury could infer that Perez was indeed still at risk, specifically, the evidence that the interlock doors malfunctioned and were not always shut, that inmates often were able to travel between the two tiers without permission, and that the tiers were cross-watched, making it difficult for the correctional officer on duty to deal with altercations that might take place.

The real issue in this case is whether Perez has evidence from which a jury could conclude that any of the defendants knew of and ignored the risk that existed following Rosario's transfer. A prisoner usually proves that jail officials knew of a risk in one of two ways: by showing that he alerted prison officials of the threat, *James v. Milwaukee County,* 956 F.2d 696, 700 (7th Cir. 1992), or by showing that the risk was so substantial that the officials' knowledge can be inferred. *Id.; see also Farmer,* 511 U.S. at 842. Here there is no claim that anyone told any of the defendants that Perez was still at risk. Perez's fight with Rosario may have alerted certain officials of the threat to his safety, but it did not alert them to the risks that continued to

exist even after Rosario's transfer.

We begin with defendants Velasco, Edwards, Lyles, and Maul. Perez has presented no evidence that could give rise to an inference that any of these defendants had any idea of his problem with Rosario, let alone of the possibility of inmates being able to travel from Tier 2E to Tier 2F. Each of these defendants is entitled to summary judgment. Perez argues that *Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998), permits imposition of liability on these defendants. In *Steidl*, the Seventh Circuit said that if a warden is aware of a systematic lapse in the enforcement of a policy whose purpose is to protect prisoners, his failure to enforce the policy can result in imposition of liability for resulting constitutional violations. *Id.* at 741. But here there is no evidence of any of these defendants' knowledge of the problem of inmate travel between Tiers 2E and 2F.

There is evidence that Lt. Scaife was aware of the risk that Rosario posed to Perez; he was called by the officer on the tier following the incident on the basketball court, and he made the decision to transfer Rosario to another tier, indicating that he realized that further violence might take place. Was Lt. Scaife aware of the fact that inmates could travel freely from the tier to which he transferred Rosario to the tier on which Perez was housed? There is no direct evidence of Lt. Scaife's knowledge. However, there is evidence that he had supervisory responsibilities that took him to the area of Division 9 that included Tiers 2E and 2F. From this, plus the evidence that movement between the tiers was common and that "cross-watching" by a single officer was the norm, the Court finds that a reasonable jury could infer that Lt. Scaife that he was aware that Perez was still at serious risk from Rosario after the transfer. Lt. Scaife is not entitled to summary judgment.

7

This leaves us with Sgt. Naverette. Perez has offered no evidence from which a reasonable jury could conclude that Naverette had any knowledge of the problem between Rosario and Perez, either before or after Rosario's transfer. The most he offers is that a sergeant was called upon to deal with the basketball court incident along with Lt. Scaife. However, there is no evidence identifying Sgt. Naverette as that sergeant. Sgt. Naverette is entitled to summary judgment.

## Conclusion

Defendant Carter's motion for summary judgment [Docket Item 65-1] is granted; his motion to strike [Item 73-1] is denied as moot. The remaining defendants' motion for summary judgment [Item 62-1] is granted as to all defendants except Lt. Delano Scaife. The date for filing the final pretrial order is reset to August 21, 2000. The case is set for a status hearing on August 23, 2001 at 9:30 a.m. to discuss the possibility of advancing the trial date.

MATTHEW F. KENNELLY
United States District Judge

Date: July 23, 2001